IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PALMER LEWIS ROBERTS, )<br>)<br>*Petitioner*, )<br>)<br>v. )<br>)<br>CINDY CHRISTINA SERRANO ROBERTS, )<br>)<br>*Respondent*. )<br>) | Case No. 1:24-cv-817 (PTG/IDD) |

## MEMORANDUM OPINION

Petitioner brings this action before the Court under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et. seq.*, to have his daughter returned from the United States from the custody of Respondent, the child's mother. Dkt. 1. This Court held a bench trial on August 22 and 23, 2024. At trial, the parties offered five witnesses and well-over one hundred exhibits. Following trial, the parties submitted proposed findings of fact and conclusions of law. Based on the evidence and witnesses presented at trial, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1.  Petitioner Palmer Lewis Roberts is an American citizen and active duty servicemember in the Space Force, currently stationed at Raf Menwith Hill Air Force Base in Harrogate, England.

2.  Respondent Cindy Christina Serrano Roberts is an American citizen and retired servicemember in the United States Air Force, currently residing in Virginia in the United States.

1

3. On October 28, 2016, Petitioner and Respondent married in Virginia. At that time, they were both on active duty in the United States Air Force and stationed in Washington, D.C. In July 2018, both were transferred to Wright-Patterson Air Force Base in Ohio.

4. In January 2019, their child, L.R., was born in Dayton, Ohio.

5. In 2020, both parties were assigned to Hickam Air Force Base in Hawaii. Thereafter, the family moved to Honolulu, Hawaii.

6. While in Hawaii, Petitioner transitioned from active-duty service in the United States Air Force to active-duty service in the United States Space Force. In 2022, Ms. Roberts retired from the United States Air Force because she was eligible for retirement and wanted to care for L.R. and support LTC Roberts' career.

7. The Roberts family lived in Hawaii for approximately three years. While living there, L.R. was enrolled in daycare and involved in several extracurricular activities, including gymnastics, swimming lessons, and ballet. She often attended church with her parents, vacation bible school, and other large church events. The family would also go on outings and walks with other families. The Roberts also enjoyed a strong support system as they would visit family located in the continental U.S. and the family would visit them as well. During this time, the Roberts experienced difficulties in their marriage.[1]

8. In spring 2022, Petitioner was advised that he was being considered for a command position at Menwith Hill in Harrogate England. Petitioner and Ms. Roberts discussed the move, with Ms. Roberts expressing some reservations about a move overseas due to their marital difficulties. Ms. Roberts discussed the move with friends and family indicating that she believed

---

[1] At trial, Petitioner and Ms. Roberts offered competing testimony on the cause and extent of their marital problems. However, the Court finds it is not necessary to resolve that issue to decide this case.

2

they would only be staying in the United Kingdom for a short time. When she made these representations with LTC Roberts present, he did not correct her.

9. In October 2022, the parties were formally notified that LTC Roberts was selected for the command tour in England. The parties' marital difficulties worsened in the years leading up to the move to England. From mid-2022 to mid-2023, Ms. Roberts continued to express her unhappiness in the marriage and desire not to join LTC Roberts on his move to England. Despite this, the parties regularly discussed the move to England because it involved a long process of preparation: completing various tasks and forms, shipping the family's belongings to England, getting medical clearance, and selecting and applying to a school for L.R. to attend. Ms. Roberts often expressed her concerns about moving so far away from friends and family, or the state of the parties' marriage during these conversations. However, she actively participated in preparing for the move. The family acquired medical clearance, shipped all of their personal belongings to England, and even selected and applied to the school that L.R. would attend in England.

10. In May 2023, LTC Roberts received his formal permanent change of station orders for RAF Menwith Hill in Harrogate, England to begin in July 2023. The tour papers stated that LTC Roberts' tour was for thirty-six (36) months.

11. Ms. Roberts testified that she expected the tour would last no longer than two years. Her experience coordinating similar orders for other servicemembers instructed that they are not longer than two (2) years. LTC Roberts testified that his three-year orders were consistent with the standard tour length for a servicemember stationed overseas with dependents.

12. On July 3, 2023, the parties officially moved to England. They terminated their lease in Hawaii and signed a one-year lease for a new home with the option to continue on a month-

to-month basis after that. Although LTC Roberts maintained property in the United States it was not intended to serve as the family home.

13. After moving to England, the family took steps to acclimate there while also maintaining some ties in the United States. The family secured a one-year lease of a home that would convert to a month-to-month lease at the end of the one-year term. LTC Roberts obtained an English driving license and Ms. Roberts was eventually authorized to drive in England. LTC Roberts also obtained international motor insurance which expired on June 10, 2025. The family also eventually enrolled in the National Health Service.

14. Ms. Roberts remains a tax-paying resident of Florida and LTC Roberts remains a tax-paying resident of Texas. Both parties remain registered to vote in the United States. Both parties maintain U.S. bank accounts, retirement accounts, and credit cards. Neither party has opened a bank account at a United Kingdom based bank. Ms. Roberts continued to work on her U.S. based company and non-profit, as well as apply for additional work opportunities in the United States.

15. The family is only authorized to live in the U.K. so long as LTC Roberts remains employed by the United States Military and on orders to serve in the United Kingdom.

16. After arriving, the Roberts completed L.R.'s enrollment at Ashville College starting in September of 2023. When completing enrollment forms, LTC Roberts indicated that L.R. would be withdrawn in July 2025.

17. L.R. also participated in activities, such as ballet and swimming, through the school curriculum. She was not registered for activities outside of school. The family also attended church. The family lived in a more isolated area where activities were less accessible than when they lived in Hawaii. At some point, L.R. developed a friendship with two of her classmates with

4

whom she had playdates.[2] The Roberts also befriended another family and had play dates and dinners with that family.

18. Over the course of their time in England, the family vacationed in the United States and Canary Islands. Each time, they returned to England. However, in August 2023, Ms. Roberts booked a one-way ticket for herself and L.R. to Buffalo, New York. While there, Ms. Roberts reiterated her unhappiness in the marriage and expressed concerns to LTC Roberts about returning to England. Nevertheless, she and L.R. returned.

19. Despite this, the Roberts' marriage continued to deteriorate through the fall of 2023 and into the winter of 2024. On February 10, 2024, their marital strife culminated in a verbal altercation. While the parties offered conflicting testimony regarding whom was the aggressor in the altercation, it is undisputed that the English police and social services became involved and the United States military conducted an investigation. The couple separated that day and continue to live separately.

20. LTC Roberts obtained a solicitor and filed for divorce on March 12, 2024. Ms. Roberts also obtained a solicitor and filed applications in the English Court to exclude LTC Roberts from the home and prevent him from contacting her. On April 20, 2024, the English Court conducted a hearing on Ms. Roberts' applications. The English Court issued an order indicating, amongst other things, that Ms. Roberts file, within two weeks, any application seeking permission to relocate the child back to the United States; the military would accompany the father to retrieve his belongings from the home; and LTC Roberts would have custody of the child from Friday after

---

[2] LTC Roberts and Ms. Roberts also offered conflicting testimony as to L.R.'s acclimation in the school. Ms. Roberts testified that L.R. became hyper aware of race, experienced an incident involving a classmate, and cried about going to school. LTC Roberts testified that L.R. was engaged and happy at school.

5

school through Monday each week. The Order noted that Ms. Roberts had represented that she would be making an application to the English Court to determine whether she could take L.R. back to the United States.

21. Ms. Roberts never filed an application. Instead, on May 2, 2024, Ms. Roberts departed England with L.R. without advising LTC Roberts prior to their departure. On that same day, the school alerted LTC Roberts that L.R. was not in school. Both LTC Roberts and the school contacted the police. After the removal was already in progress, Ms. Roberts emailed her solicitor and directed him to inform LTC Roberts that she was taking the child. Ms. Roberts and L.R. flew from Manchester, England, to Dublin, Ireland, to Dulles, Virginia.

22. On May 3, 2024, LTC Roberts submitted a Hague Convention Return Application to the Central Authority for England and Wales.

23. On May 4, 2024, LTC Roberts learned that L.R. was in the United States.

24. On May 15, 2024, LTC Roberts learned that L.R. was in Virginia and filed this civil action in this Court.

## CONCLUSIONS OF LAW

1. LTC Roberts filed this action pursuant to the Hague Convention, as implemented by ICARA in the United States. The purpose of the Hague Convention is to prevent the wrongful removal or retention of children from a nation that is a party to the convention and deter parents from seeking out more sympathetic courts for their custody disputes. *See Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 611 (E.D. Va. 2002).

2. The convention was designed to allow "signatory nations…to protect children internationally from the harmful effects of…wrongful removal or retention and…ensure their

prompt return to the State of their habitual residence...." *Id.* (quoting *Miller v. Miller*, 240 F.3d. 392, 398 (4th Cir. 2001)).

3. ICARA requires that "a petitioner [carry] the burden of proof [to] establish by a preponderance of the evidence that [a] child was wrongfully removed or retained within the meaning of the Convention." *Velasquez v. Funes de Velasquez*, 102 F. Supp. 3d 796, 800 (E.D. Va. 2015).

4. To establish a wrongful removal claim, the Petitioner must show three elements: (1) L.R. was habitually resident in England at the time of removal to the United States; (2) the removal was in breach of Petitioner's custody rights under English law; and (3) the Petitioner was exercising his custodial rights at the time of removal. *See id.* (citing *Miller*, 240 F.3d. at 398). Petitioner has not met his burden because he has failed to establish the first element: L.R. was habitually resident in England at the time she was removed to the United States.

5. In this case, it is not disputed that LTC Roberts was exercising his custodial rights at the time of removal. In fact, the Court finds that evidence presented at trial establishes that he is a loving, devoted, and committed father who was and continues to be active in L.R.'s life. Since the inception of this action, LTC Roberts has travelled to the United States multiple times to see L.R. Moreover, Respondent has not disputed that the removal was in breach of Petitioner's custody rights under English law. *See* Dkt. 76. The only dispute in this case is whether L.R. was habitually resident in England at the time of removal to the United States.

6. Habitual residence is not defined in the Convention, but the Supreme Court has offered guidance on the habitual residence inquiry. In *Monasky v. Taglieri*, the Supreme Court held that "a child's habitual residence depends on the totality of the circumstances specific to the case." 589 U.S. 68, 71 (2020). The Court noted that the term "habitual… suggest[s] a fact-

7

sensitive inquiry, not a categorical one." *Id.* at 77. In doing so, the Court emphasized that courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d. 729, 744 (7th Cir. 2013)). For example, older children may be able to acclimatize to a particular place but the residence of younger children may depend more on "the intentions and circumstances of caregiving parents." *Id.*

7. Ultimately, the Court concluded that no actual agreement between the parents is required or dispositive, nor is an infant's "mere physical presence." *Id.* at 81. Instead, a court must look to a "wide range of facts…including facts indicating that the parents have made their home in a particular place." *Id.* "The bottom line: There are no categorical requirements for establishing a child's habitual residence…." *Id.* at 80. Since *Monasky*, the Fourth Circuit has affirmed that courts should look to the child's integration as well as the parent's intentions. *Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 360 (W.D. Va. 2021), *aff'd* 2022 WL 34141 (4th Cir. Jan. 4, 2022). Some courts have noted that military families do not present the typical fact pattern and concluded that conditional stays may not demonstrate a shared intention to shift a child's habitual residence away from the country where they previously resided. *See Holder v. Holder*, 392 F.3d. 1009, 1018-19 (9th Cir. 2004).

8. The Fourth Circuit articulated factors that courts should consider as relevant to the habitually resident analysis to determine parental intent. *Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009). Those include: "parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Maxwell*, 588 F.3d at 252. Taken together, it appears that the intentions and

8

circumstances of the parents, acclimatization, and other facts are all relevant to this Court's determination of where the child was habitually resident.

9. In the instant action, this Court finds that the evidence demonstrates that the child's habitual residence had not shifted from the United States to England at the time she was removed from England.

10. Turning first to the facts regarding the parent's conduct in England. The Court observes that (1) the parties shipped the majority of their belongings to England; (2) rented two homes in England -- the original family home and the rental property the Petitioner acquired upon separating from Ms. Roberts; (3) Petitioner has yet to receive orders conclusively establishing his assignment after England; (4) the parties terminated their lease in Hawaii prior to the move; (5) the parties enrolled in the National Health Service; and (6) the parties did not maintain a property they were going to use as the family's home in the United States.

11. With respect to L.R.'s acclimatization, the Court observes that (1) L.R. was enrolled in school in England; (2) participated in activities such as going to theatre productions and restaurants with Petitioner; and (3) has friends with whom she has had playdates.

12. While some of these facts tend to suggest L.R. and the family had acclimated to England, the preponderance of the evidence establishes that L.R. and the family's habitual residence did not yet shift from the United States. Like *Holder v. Holder*, this case involves a military family with strong ties in the United States and no indication that the family intended to stay in England beyond LTC Roberts' tour albeit two or three years. 392 F.3d. 1009 (9th Cir. 2004).[3] The evidence shows that: (1) each is an American citizen; (2) both LTC Roberts and Ms. Roberts served as active U.S. military members and were stationed at multiple bases in the United

---

[3] The Court notes this case was decided pre-*Monasky*.

9

States and at times abroad; (3) each of these tours were only for a limited time; (4) much of L.R.'s extended family resides in the United States; (5) the parties had only been living in England for ten months at the time Respondent removed L.R; and (6) prior to the move to England, L.R. had lived her entire life in the United States.

13. Looking to the intentions and circumstances of the parents, it is undisputed that Petitioner and Respondent, knew that their time in England was for a specific and delimited period— LTC Roberts' command tour. In any event, both parties expected that their stay would be no longer than three years. Critically, the parties here primarily dispute whether that period was to last for two years or three years. Petitioner does not contend that the stay may have been permanent, longer term, or that the family intended or even discussed making England their settled home.

14. It is similarly undisputed that Ms. Roberts and LTC Roberts had many discussions regarding where they might go at the conclusion of LTC Roberts' command tour. Ms. Roberts credibly testified that all considered destinations were within the United States and Petitioner did not refute this testimony. The testimony of several witnesses also corroborates that Respondent was under the impression that they would return to the United States at the conclusion of the tour.

While it appears to the Court that the parties did not agree on where they would reside in the United States, the evidence overwhelmingly supports that they intended to return to the United States, rather than remain in England or another country.[4]

15. The Court is also persuaded by the evidence of the parties' extensive ties to the United States. For instance, (1) the parties maintained American bank accounts and credit cards; (2) the family has never paid English taxes but continue to pay taxes in the United States; (3) the

---

[4] The Court notes that actual agreement is not required under *Monasky*. 589 U.S. at 80-81.

family did not have nor did they apply for the immigration status necessary to legally reside in England independent of Petitioner's employment; (4) the parties only rented property in England rather than purchasing property; (5) Respondent applied for jobs in the United States and not England; and (6) the parties maintained their U.S. driver's licenses. There is also no evidence in the record that the parties have any family ties to England or countries other than the United States. In *Farr v. Kendrick*, a case involving parents who were Navy veterans and who had relocated to Mexico for a temporary work assignment, the court ruled similar facts cut towards the United States being the habitual residence for the family including that: (1) the father made several trips to the United States; (2) the father continued using an American bank account and American car insurance; (3) the family had temporary visas to enter Mexico; (4) the mother made multiple requests to return to the United States; and (5) all of the petitioner's extended family lived in the United States.[5] 2019 WL 2568843, at *4-*5 (D. Ariz. June 21, 2019).

16.    In any event, courts have usually tried to ascertain whether the parents intended to make their moves permanent or long-term or whether they were both under the impression that their stay in another country was temporary. *See e.g., Holder v. Holder*, 392 F.3d. 1009, 1017-1018 (9th Cir. 2004). As well as being a military family on a limited assignment, the parents in *Holder* similarly experienced marital difficulties just prior to their move overseas, which intensified while there. *Id.* at 1012. The parties also disputed whether the stay was limited to the four-year assignment or more permanent. *Id.* at 1016. Notably, Respondent presented copious social media messages to family friends reflecting her impression that the family would return to

---

[5] Although *Farr* was decided pre-*Monasky*, the Ninth Circuit concluded that the district court's findings in *Farr* still satisfied *Monasky's* totality of the circumstances standard because its findings were thorough and "had before it all the facts relevant to the dispute." 824 F. App'x 480, 481-83 (9th Cir. 2020) (quoting *Monasky*, 589 U.S. at 85).

11

the United States at the conclusion of the tour. One of Respondent's witnesses credibly testified that Petitioner did not correct Respondent's impression that their stay in the U.K. would only be for a brief period. Petitioner has not offered any testimony that he believed the move would be permanent, for a longer term, or that the family would go anywhere other than the United States. Much like *Holder*, the Court is persuaded that "their stay in [England] was but another temporary assignment that was part of [LTC Roberts'] military duties." *Id.* at 1017.

17. Turning to marital stability and stability of the home environment, the Court finds that this factor also cuts towards the habitual residence not shifting to England. It is undisputed that the parties experienced marital difficulties just prior to the move to England, which worsened while there. The record also reflects that Respondent communicated to Petitioner her unease with remaining in England with L.R. and expressed her desire to return to the United States on several occasions.[6] The parties' marital dysfunction was so severe that it culminated in a physical altercation which precipitated their separation and pending divorce. While the parties testified at length as to who was at fault for their marital strife, that is immaterial to this inquiry. The fact that there was undeniable strife created a larger question as to whether Respondent and L.R. would accompany, or continue to reside with LTC Roberts in England.

18. It is not clear how to weigh acclimatization for L.R., given her age. In these cases, some courts have put more emphasis on the shared intent of the parents. *Hiroki v. Hiroki*, 698 F. Supp. 3d 1023, 1034 (N.D. Ohio 2023). *Monasky* cautions that no single fact is dispositive. *Nowlan*, 543 F. Supp. 3d at 360 (quoting *Monasky*, 589 U.S. at 68). In any event, ten months does

---

[6] The parties dispute whether they discussed the possibility of Petitioner "geo-baching" for the length of the tour because of their difficulties and in order to maintain stability for L.R. Geo-baching describes what happens when the active military member travels to their overseas assignment while their family stays behind or moves to the member's subsequent assignment location.

12

not appear to be enough time for even an older child to acclimate to a new country, especially when they have spent most of their life in another country. Depending on the circumstances, courts have tended to find children not habitually resident in other countries where their stays were shorter than a year. *See. e.g., Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1220 (D.C. Cir. 2019); *Neiuwenhoven v. Pisani*, 2023 WL 4930852 at *3 (M.D. Fla. Feb. 23, 2023).

19. Here, L.R. was unlikely to have acclimatized. Additionally, there is also conflicting evidence on whether or not she was struggling to adjust. Notwithstanding the parties' dispute over the extent and quality of her adjustment to life in England, even if the Court wanted to weigh her acclimatization more heavily, the conflicting evidence presented suggests it cannot count for very much.

20. Although L.R.'s age makes the question of acclimatization uncertain, this Court is persuaded that even if she was in the process of acclimating, the process was not complete because (1) she was only there for ten months—an insufficient passage of time to acclimate; (2) she was not comparably as socially active as she had been while living in the United States; and (3) most importantly, at five years old, she may be "remarkably adaptable" but potentially still aware "that [she] has another life to go back to." *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001), *abrogated by Monasky v. Taglieri*, 589 U.S. 68 (2020). Except for the ten months the family lived in England, all of "[L.R.'s] childhood memories are from [the United States]," where, by most accounts, "she lived a fully integrated life." *Nowlan*, 543 F. Supp. 3d. at 360.

21. Under the totality of the circumstances, this Court finds that the habitual residence of the family and the child had not shifted to England at the time Respondent removed L.R. to the United States.

22.     This Court does not doubt that the parties love L.R. Additionally, this Court's duty is to determine whether L.R. was wrongfully removed within the meaning of *ICARA*, not wrongfully removed in a moral sense. To be clear, this Court does not in any way condone Ms. Roberts' removal of L.R. from England without telling LTC Roberts. He is the father; he was exercising his custodial rights, and had every right to know. To determine whether the removal was wrongful under the ICARA, the Court must determine whether Petitioner established each element of the prima facie case for wrongful removal by a preponderance of the evidence. Here, the Court finds that the evidence does not support that L.R. was habitually resident in England at the time she was removed to the United States.

23.     Accordingly, this petition is denied and dismissed.

An appropriate order will issue.

/s/
Patricia Tolliver Giles
United States District Judge

December 20, 2024
Alexandria, Virginia